FILED

07/28/2020

Bowen Greenwood
CLERK OF THE SUPREME COURT
STATE OF MONTANA

Case Number: DA 19-0559

DA 19-0559

IN THE SUPREME COURT OF THE STATE OF MONTANA

2020 MT 189N

IN THE MATTER OF:

L.O.,

    A Youth in Need of Care.

APPEAL FROM:    District Court of the Eighth Judicial District,
In and For the County of Cascade, Cause No. BDN 17-039
Honorable Elizabeth Best, Presiding Judge

COUNSEL OF RECORD:

    For Appellant Mother:

    Meri K Althauser, Forward Legal, PLLC, Missoula, Montana

    For Appellant Father:

    Gregory D. Birdsong, Birdsong Law Office, PC, Santa Fe, New Mexico

    For Appellee:

    Timothy C. Fox, Montana Attorney General, Katie F. Schulz, Assistant
Attorney General, Helena, Montana

    Joshua A. Racki, Cascade County Attorney, Valerie M. Winfield, Deputy
County Attorney, Great Falls, Montana

Submitted on Briefs: May 27, 2020

Decided: July 28, 2020

Filed:

_____
Clerk

Chief Justice Mike McGrath delivered the Opinion of the Court.

¶1    Pursuant to Section I, Paragraph 3(c), Montana Supreme Court Internal Operating Rules, this case is decided by memorandum opinion and shall not be cited and does not serve as precedent.  Its case title, cause number, and disposition shall be included in this Court's quarterly list of noncitable cases published in the Pacific Reporter and Montana Reports.

¶2    J.O. ("Father") and L.W. ("Mother") appeal from an Eighth Judicial District Court, Cascade County, order terminating their parental rights to L.O.  We affirm.

¶3    On February 2, 2017, the Department of Public Health and Human Services ("Department") filed a petition for emergency protective services ("EPS"), adjudication of L.O. as a youth in need of care ("YINC"), and temporary legal custody ("TLC") with the District Court.  The petition alleged that the Parents suffered from mental health problems, notably, delusional disorders that created a substantial risk of physical neglect due to exposure to unreasonable risks and psychological harm to L.O.  Parents delusions included a belief that a man infected with HIV named Brandon was breaking into their home, urinating and ejaculating on their walls and ceiling, and superimposing images of genitals, sexual acts, and knives on surfaces throughout their home.  Father also believed that the wood grains on the cabinet depicted people from California that he called "The Family," who came to Montana to deal large quantities of heroin.  These delusions caused Parents to repeatedly call law enforcement to investigate the alleged break-ins, barricade their doors and windows, hang a knife above the door (Father explained the

knife was positioned so that when an intruder opened the door, the knife would come down and stab them), and scrub semen and urine off the walls to "kill the virus." The Parents insisted that L.O. also saw the depictions in the pictures, but L.O. reported that she never saw them, nor did law enforcement or Department personnel. L.O. stated that she did not like it when her parents tried to make her see the knives and that "she was afraid that the bad people" would break in and "spread disease."

¶4 On February 3, 2017, the District Court granted the Department's petition for EPS and TLC of L.O. and set a show cause hearing for March 2, 2017, on the Department's petition to adjudicate L.O. as a YINC. On March 3, 2017, Parents' hair tests came back positive for methamphetamine. On March 6, 2017, after the show cause hearing, the District Court issued an order maintaining the Department's TLC of L.O and adjudicated L.O. as a YINC. At a March 23, 2017 disposition hearing, the court approved treatment plans for Parents, without objection, to address their mental health issues, possible chemical dependency issues, and housing stability.

¶5 Parents received chemical dependency evaluations by Dr. Patrick Davis and Dr. Robert Page. Dr. Davis recommended that both birth parents complete chemical dependency treatment and mental health counseling. Dr. Page found that delusions of the birth parents rendered them unsafe to parent. Mother completed her chemical dependency evaluation and was recommended for outpatient treatment but was discharged with an indication of "maximum benefit met." Father, due to his mental health issues, failed to complete his chemical dependency evaluation.

3

¶6    As part of their treatment plans, Parents were directed to seek mental health counseling and treatment for their mental illness; those efforts failed. Mother was referred to Dawn Handa for mental health counseling. Handa identified impaired thought processes, paranoid ideations/obsessions, and delusions. Handa ultimately terminated her services to Mother because she remained delusional and failed to make any progress during treatment. Handa offered to refer Mother to another provider; Mother declined the referrals and medication. Father sought mental health services from Barb Bottomly; however, after several sessions, Bottomly determined that treatment would not be possible since she was unable to establish any therapeutic goals because Father believed his delusions were real and that he did not need to change. As a result of Parents' failure to complete their treatment plans, on May 9, 2019, the Department filed a petition for permanent legal custody and termination of parental rights ("TPR") of L.O.

¶7    On August 29, 2019, after two hearings on the Department's petition for TPR, the District Court issued its order terminating the parent-child relationship between L.O. and Parents. The court granted permanent legal custody of L.O. to the Department and determined that her current placement was in her best interests (in April 2017, L.O. was placed in kinship placement with Father's natural adult son and his wife). The court found that Parents' failure to complete their treatment plans and the inadequacy of the portions completed rendered them unfit to parent L.O. and failed to address the Department's continued concerns with their mental health and ability to provide a mentally and emotionally healthy living environment for L.O. The court further found that the conduct or condition rendering Parents unfit was unlikely to change within a

4

reasonable time due to the fact that they failed to complete their treatment plans. The court concluded that clear and convincing evidence showed that continuation of the parent-child legal relationship between L.O. and Parents would likely result in an ongoing risk of abuse and/or neglect to L.O. Accordingly, the court concluded the best interests of L.O.'s physical, mental, and emotional condition would be best served by termination of the parent-child legal relationship. Parents appeal.

¶8 Parents assert the District Court committed reversible error by: (1) failing to consider whether the Department complied with the Americans with Disabilities Act ("ADA"); (2) failing to order a new treatment plan for Father; and (3) terminating parental rights without sufficient evidence. We decline to address issues one and two since those claims were not preserved for appeal. Litigants must assert statutory violations in district court, and we will not fault a district court for failing to address such issues. *In re T.E.*, 2002 MT 195, ¶ 23, 311 Mont. 148, 54 P.3d 38. Issues one and two were not raised below, and the District Court did not commit plain error in failing to sua sponte apply the ADA or order Father's treatment plan—which he stipulated to while represented by counsel—be amended.

¶9 This Court reviews a district court's decision to terminate parental rights for an abuse of discretion. *In re A.S.*, 2016 MT 156, ¶ 11, 384 Mont. 41, 373 P.3d 848. A district court's findings of fact are reviewed for clear error and conclusions of law for correctness. *In re M.V.R.*, 2016 MT 309, ¶ 23, 385 Mont. 448, 384 P.3d 1058. This Court will not disturb a district court's decision on appeal unless there is a mistake of law

5

or a finding of fact not supported by substantial evidence that would amount to a clear abuse of discretion. *In re A.B.*, 2020 MT 64, ¶ 23, 399 Mont. 219, 460 P.3d 405.

¶10 Mother contends that the District Court lacked sufficient evidence to adjudicate L.O. as a YINC and terminate her parental rights. Her argument regarding L.O.'s adjudication as a YINC relies on her assertion that the ADA was violated. She contends that had the Department complied with the ADA then she would have been provided with an individualized assessment prior to adjudication and L.O. may not have been removed. However, as explained above, Mother's ADA claim is not properly before this Court.[1]

¶11 The District Court relied on sufficient evidence and did not err in terminating both parental rights. A court may order a termination of the parent-child relationship upon a finding established by clear and convincing evidence that the child is an adjudicated YINC, and: (1) a treatment plan approved by the court has not been complied with or has not been successful; and (2) the conduct or condition of the parents rendering them unfit is unlikely to change within a reasonable time. Section 41-3-609(1)(f), MCA. Minimal compliance with a treatment plan does not equal successful completion and is insufficient to prevent termination of parental rights. *In re S.M.*, 1999 MT 36, ¶¶ 23-26, 293 Mont. 294, 975 P.2d 334. In determining whether a parent's conduct or condition is likely to

---

[1] Regardless, sufficient evidence existed to adjudicate L.O. as a YINC. A YINC is a child who has been "abused or neglected" due to harm that occurs when a parent "inflicts or allows to be inflicted upon the child physical abuse, physical neglect, or psychological abuse or neglect." Section 41-3-102(21)(a)(i), (33), MCA. The District Court did not err in concluding that the Parents' delusions and actions related to those delusions exposed L.O. to an unreasonable risk of psychological abuse and neglect. It was clear that the Parents' delusions were impacting L.O., as made evident from L.O.'s statements that she did not like it when her parents insisted on telling her to see their delusions and that her Parents' behavior made her scared of intruders coming into her home and spreading diseases.

change in a reasonable time, a court must consider the "emotional illness, mental illness, or mental deficiency of the parent of a duration or nature as to render the parent unlikely to care for the ongoing physical, mental, and emotional needs of the child within a reasonable time." Section 41-3-609(2)(a), MCA; *In re X.M.*, 2018 MT 264, ¶ 29, 393 Mont. 210, 429 P.3d 920. In determining a parent's unfitness and likelihood of changing, the important question is whether the parent is likely to make enough progress within a reasonable time. *In re D.F.*, 2007 MT 147, ¶ 43, 337 Mont. 461, 161 P.3d 825. In considering what constitutes a reasonable time, "the needs of the child are always paramount" to the parent's rights. *In re D.F.*, ¶ 43.

¶12 The District Court did not err in terminating Parents' parent-child relationship with L.O. Parents failed to successfully complete their treatment plans, despite reasonable efforts taken by the Department. This proceeding has lasted more than three years without any indication that Parents are willing or able to resolve their mental health issues. The Department intervened for two years and made reasonable efforts to reunify the family. The Department conducted several investigations and interviews, referred the Parents to chemical dependency, mental health, and parent-child evaluations, conducted random drug testing, made referrals to numerous health services to help treat the Parents' illnesses, and regularly held meetings to review the Parents' treatment plans. The Department also extended TLC multiple times to allow Parents more time to work with mental health providers and complete a parent-child safety assessment.

¶13 In concluding that Parents' mental health issues, rendering them unfit to parent L.O., was unlikely to change in a reasonable time, the District Court relied on extensive

record evidence. Several witnesses testified in support of this conclusion, including Dr. Davis who explained that "ongoing exposure of a child to [parents] expressing distortions of reality on a daily basis . . . was potentially very, very damaging [and] very, very unhealthy for the child, and is almost a guarantee that the child would grow up to have serious emotional disturbance." While Parents persistently fail to pursue necessary treatment, the clock ticks for L.O. until it is unreasonable to wait any longer. *See In re A.S.*, ¶ 17. As supported by witness testimony, continued exposure to Parents' mental illness would impact L.O.'s own perception of reality, creating significant emotional disturbance and influencing L.O.'s attempts to attain a fulfilling and meaningful life.

¶14 This Court will not substitute its judgment for that of the trial court regarding weight given to the evidence. *In re A.K.*, 2015 MT 116, ¶ 31, 379 Mont. 41, 347 P.3d 711. The District Court relied on sufficient evidence in terminating the parent-child relationship.

¶15 We have determined to decide this case pursuant to Section I, Paragraph 3(c) of our Internal Operating Rules, which provides for memorandum opinions. This appeal presents no constitutional questions, no issues of first impression, and does not establish new precedent or modify existing precedent.

¶16 Affirmed.

/S/ MIKE McGRATH

We Concur:

/S/ JAMES JEREMIAH SHEA
/S/ INGRID GUSTAFSON
/S/ DIRK M. SANDEFUR
/S/ JIM RICE

8